IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 14, 2004 Session

## HORACE DEMON PULLIAM v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-D-2554      Cheryl Blackburn, Judge**

_____

**No. M2004-00087-CCA-R3-PC - Filed March 31, 2005**

_____

The petitioner, Horace Demon Pulliam, appeals the dismissal of his petition for post-conviction relief alleging that the post-conviction court erred in finding that he received effective assistance of counsel.  After a review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Charles Edward Walker, Nashville, Tennessee, for the appellant, Horace Demon Pulliam.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Factual Background**

The facts of the offense resulting in the appellant's conviction were set out in this court's opinion on direct appeal as follows:

> Serena Stark testified that on July 5, 1998, she, Corey Manning, and Anthony Middlebrooks, the deceased victim, were driving back to Stark's residence when Middlebrooks requested they stop at an apartment on Clifton Avenue.  They stopped, and Middlebrooks went inside while Stark and Manning remained in the vehicle.  Middlebrooks returned very shortly and stated they had to leave quickly because he "had a bad go-around with some guy that was inside, and that we needed to get out of there."  As they drove away, Stark saw an African-American male hurriedly get in an early

1990's maroon Chevrolet Caprice Classic. Within approximately one minute, they stopped at a red traffic light. The Caprice pulled behind them, its door opened, and shots were fired. Stark and Middlebrooks were hit by bullets, and the Caprice fled the scene. They drove towards the hospital but stopped to seek help from two police officers parked at a car wash. Stark further stated that no one in the vehicle had a weapon.

Corey Manning corroborated Stark's testimony and additionally stated Middlebrooks, upon his return from the apartment, stated "he ran into a guy that he robbed not too long ago," and he wished he had a gun.

Officer Ryan Garland testified he and Officer Shannon Beck were in their cruisers at a car wash parking lot on July 5th at approximately 10:30 p.m. Garland saw Stark's car speed toward them, and a maroon Chevy Caprice Classic hurriedly turn onto another street. Stark and Manning exited their car, informed the officers of the shooting, and described the vehicle which the shooter drove. Officer Beck unsuccessfully attempted to chase the maroon Caprice while Officer Garland tended to Stark and Middlebrooks. Although Middlebrooks initially had a pulse, he died before arrival of the ambulance.

Alfonso Gregory testified that he was smoking marijuana in the Clifton Avenue apartment on the evening of July 5th. Middlebrooks entered, purchased cocaine and exited within two minutes. Although Middlebrooks and [the petitioner] saw each other, they did not speak. He testified his brother, Jerome, gave [the petitioner] his .44 revolver after Middlebrooks' departure. [The petitioner] then left, and his vehicle "spit gravel [going] out of the driveway . . . ."

Jerome Gregory was smoking marijuana and ingesting Valium in the Clifton Avenue apartment on the evening of July 5th. He stated Middlebrooks entered the apartment, purchased cocaine, and exited. He explained Middlebrooks had previously robbed [the petitioner], and when Middlebrooks left, [the petitioner] requested the witness' .44 revolver. Gregory complied with the request and [the petitioner] "jumped in his car" and left.

Antwan Nesby was also smoking marijuana in the Clifton Avenue apartment. Nesby stated that Middlebrooks came into the

apartment, and when Middlebrooks left, [the petitioner] requested to see Jerome Gregory's .44 revolver. Jerome Gregory gave [the petitioner] the revolver, and [the petitioner] left.

Detective E.J. Bernard responded to the shooting. Bernard went to the Clifton Avenue apartment and recovered a partial box of .44 ammunition, which was sent to the crime laboratory for analysis. He interviewed the persons in the apartment, and they picked [the petitioner] from a photo lineup. Officers had prior information concerning [the petitioner], and they searched for him at several locations. At one of the locations, they saw a 1991 maroon Caprice "backed into the back yard beside the house." The owner consented to a search of the residence, but nothing relevant was recovered. Officers then towed the Caprice. [The petitioner] was located and arrested on July 7th. Officers obtained a search warrant for the Caprice, which [the petitioner] said was "his car, but it was in his mother's name so it wouldn't be confiscated." Nothing relevant was discovered in the vehicle search.

Terrie Arnie, a firearms identification expert, examined the bullet recovered from Middlebrooks and opined he was killed with a .44 revolver. Arnie additionally stated that she tested a box of .44 cartridges she received from Det. Bernard. She stated the cartridges were consistent with the bullet recovered from Middlebrooks.

Patricia Drew, [the petitioner]'s aunt, testified her residence is located approximately 20 minutes from the crime scene. She stated that on July 5th, [the petitioner] came by and used her phone at 9:45 p.m. or 10:45 p.m. She said he stayed at her house for approximately 15 minutes.

[The petitioner] testified he was "in and out" of the Clifton Avenue apartment several times on July 5th because he was trying to sell a shotgun. He further stated he often sold Middlebrooks cocaine. Although he said Middlebrooks robbed him approximately four months prior, he said he "wasn't even thinking about it" anymore. He testified that when Middlebrooks left, he went back into the apartment and placed marijuana in his hollowed out cigar. Then, he said his beeper activated indicating a customer required a meeting, and he left approximately three minutes after Middlebrooks. [The petitioner] conceded he was driving the 1991 Caprice that evening but denied any involvement in the shooting as well as taking a gun from Jerome Gregory.

-3-

State v. Horace Demon Pulliam, No. M2001-00417-CCA-R3-CD, 2002 WL 122928, at ** 1-2 (Tenn. Crim. App. at Nashville, Jan. 23, 2002). The petitioner was convicted of premeditated first degree murder and sentenced to life imprisonment.

On August 5, 2002, the petitioner timely filed a pro se petition for post-conviction relief, asserting ineffective assistance of counsel. Subsequently, counsel was appointed and an amended petition was filed. In support of his claim for relief, the petitioner alleged that (1) trial counsel was ineffective by failing to request the dismissal of a juror or request a mistrial when counsel learned of the prosecutor's ex parte communications with the jury foreman; (2) trial counsel was ineffective by failing to ascertain the extent of the juror's ex parte communications with the prosecutor and a police officer outside the courtroom; (3) trial counsel was ineffective by failing to investigate or question whether the police officer involved in the ex parte communication with the juror was associated or connected with the prosecution of the petitioner's case; (4) trial counsel was ineffective by failing to inform the court that the jury foreman attempted to communicate with the petitioner from the jury box on numerous occasions during the trial; (5) trial counsel was ineffective by failing to subpoena, investigate, or interview a material witness, and investigate or interview the witness; and (6) trial counsel was ineffective by failing to call a rebuttal expert witness to contradict the state's expert witness regarding ballistic matches.

At the evidentiary hearing, the petitioner testified that a juror attempted to communicate with him during trial. According to the petitioner, he wrote a note to trial counsel advising him that a juror was talking to the petitioner from the jury box. The petitioner stated:

> I mean, I'm no lip reader, but the guy was talking to me. You had somebody on the stand, the guy was sitting there with his legs crossed with his hands up talking to me. Like your name Roger. Like I'm sitting there, he's sitting here (indicating), and he's saying something to me.

Trial counsel advised the petitioner that he would attempt to "catch him doing it."

The petitioner said that approximately one to two hours later, following a recess, the prosecutor advised the trial court that he had communicated with a juror. The prosecutor explained that he thought the juror was a bonding agent named Emmett Jenkins. Also present during the conversation was Officer Collins who was there to testify for the State. The petitioner asserted that trial counsel should have asked that the juror be dismissed. The petitioner stated that the prosecutor asked that the juror be removed; however, trial counsel asked the court to allow the juror to remain because "[trial counsel] was trying to get it over with. The guy was trying to get paid."

The petitioner alleged additional instances of ineffective assistance, asserting that he was not supplied copies of tapes from his preliminary hearing or taped statements of witnesses, counsel failed to object to the prosecutor's description of the petitioner as a "drug dealer," counsel allowed the

introduction of hearsay testimony, counsel failed to interview three witnesses who were at the house where the drug transaction occurred and counsel failed to subpoena additional witnesses. The petitioner testified that one of the witnesses, Constance Campbell,[1] would have testified regarding the weapons he had on the night of the offense and would have confirmed that he had a "run-in" with Jerome and Alfonso Gregory. Counsel also failed to introduce a photograph of the petitioner's car. The petitioner stated that his car did not have tinted windows or hubcaps and therefore did not match the description provided by witnesses at trial.

The petitioner further asserted that counsel should have requested that the petitioner undergo a psychological evaluation. According to the petitioner, on the day of trial "I wasn't myself, you know what I'm saying. That should have been, you know what I'm saying, went on record. Somebody should have come and talked to me that day. I mean, that day I didn't even want to, you know what I'm saying, present myself properly."

The petitioner contended that counsel should have called an expert in the area of ballistics to rebut the testimony of the State's expert. Specifically, the petitioner testified that trial counsel was not adequately prepared to cross-examine the State's expert. The petitioner stated that "she [the State's expert] could have said that a bullet was made out of bubble gum, and he probably would have been like, wow." The petitioner asked the court to take judicial notice of an "online" article he had read concerning ballistics and markings on bullets. The petitioner maintained that if an expert had testified on his behalf, the outcome of his trial would have been different.

Bret Gunn, the assistant district attorney general who prosecuted the petitioner's case, was called by the petitioner to testify. General Gunn testified that he could not specifically recall the person to whom he spoke on the morning of the petitioner's trial. He explained:

> I just remember talking to the guy, the juror, out in the hall and then realizing later in the morning that it - - that it was a juror and that I needed to bring that to the Court's attention. And I told the Court everything I could tell them about it. And at this point - - if I said something about the officer being there at that time, then I'm sure he was. But I don't remember it now.

On cross-examination, General Gunn confirmed that his comments were inadvertent and were unrelated to the petitioner. After advising the court of the conversation, General Gunn requested that the juror be removed from the panel because of his concern that the juror might think he was incompetent or trying to influence him. General Gunn stated that he never saw the juror "make any facial indications in any way" toward the petitioner.

Officer Henry Collins was also subpoenaed to testify at the evidentiary hearing. Officer Collins testified that he remembered the petitioner's name and recalled that he had gone to court

---

[1] Throughout the record, Constance Campbell is also referred to as Constance McEwen.

regarding the petitioner's case. However, he had no recollection of any conversation with a juror. He could not recall any details about the petitioner, his case, or the day of his trial.

Agent Teri Arney,[2] a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that she reviewed some of the evidence in the petitioner's case and testified at his trial. Agent Arney summarized her trial testimony, explaining that "I was - - I actually examined some- - two bullet jackets with a bullet that came from the victim, and I was able to match one of those bullets with the bullet from the victim as having been fired in the same firearm." Agent Arney confirmed that a weapon was not submitted for analysis. Agent Arney stated that she did not testify at trial that the bullets she examined came from a particular box of ammunition, only that they were made by Winchester and were the same type of ammunition as the ammunition in a box provided to her by Detective E.J. Bernard.

Kenneth Neal testified that he became acquainted with the petitioner on July 5, 1998. They met through a mutual friend at West Nashville Projects located "off of 40th and Clifton." Neal said that between 10:00 and 11:00 p.m., he and DeShawn Campbell were standing on the sidewalk when he saw the petitioner getting into his car. The petitioner told Neal that "he would holler at us later, and he left." Neal acknowledged that he was not aware of the petitioner's case until he encountered the petitioner at Riverbend, where they were both incarcerated. When the petitioner told Neal about his case, Neal recalled that he had seen the petitioner on the night of the offense.

The petitioner's trial counsel testified that he represented the petitioner during the proceedings in circuit court but did not represent him at the preliminary hearing. Counsel reviewed a tape of the preliminary hearing and concluded that it did not contain anything of "strategic value" for trial. The petitioner did not ask for a copy of the tape until after the trial. Counsel explained to the petitioner that the tape of the preliminary hearing had not been transcribed and it did not contain anything of value to him.

Counsel explained that the petitioner told him that on the night of the offense, the petitioner received a page from a drug customer in Madison. According to the petitioner, he could not have been at the location of the homicide because he was across town selling cocaine. Counsel and the petitioner concluded that even if they could find the customer, he would be unlikely to come to court and admit under oath that he purchased cocaine from the petitioner.

Counsel stated that the petitioner consistently maintained that at the time of the offense he was in Madison, approximately twenty-five to thirty miles away, selling cocaine. Counsel never heard DeShawn Campbell's name mentioned, nor was Neal's testimony at the post-conviction hearing consistent with the petitioner's claims at the time of trial. Counsel recalled that he had copies of witness statements before trial. He was not surprised by Jerome Gregory's testimony, and, in fact, counsel attempted to show that Gregory had received some type of special treatment from the State.

---

[2] In this court's direct opinion the agent's last name is spelled Arnie.

Counsel reiterated that the petitioner's defense was that he was not present when the offense occurred. Accordingly, the type of bullets used and whether the bullets were consistent or inconsistent with those in the box of ammunition had no relevance to the theory of defense. Counsel explained that

> like I said, with the I wasn't there defense, it was my position if we
> started trying to distance ourselves from that box of ammunition, the
> jurors are going to think, well, why do you care. If your man was
> across town, why do you care what was in that box and who did it.

Counsel stated that he had no reason to believe that the petitioner was "not himself" during trial or was not aware of what was occurring during trial. Counsel pointed out that during trial, the petitioner wrote notes and at one point asked if the State's offer of a twenty year sentence to be served at eighty-five percent was still available. When he advised the petitioner that the State's offer had been increased to twenty-five years, the petitioner asked counsel to calculate the difference in the time he would have to serve. Counsel testified, "So that didn't appear to me to be someone who wasn't aware, cognizant of what was going on." Counsel provided several of the notes written to him by the petitioner during trial.

Counsel recalled that Constance Campbell was first brought to his attention by General Gunn. General Gunn advised counsel that Campbell's testimony was not beneficial to the State but that she could be of benefit to the petitioner. He provided counsel with Campbell's name and telephone number. Thereafter, counsel learned that Campbell was incarcerated and sent his investigator to speak with her. After reviewing a tape of the interview, counsel was concerned that Campbell might commit perjury, and he did not feel comfortable calling her to testify. Counsel recalled:

> I don't know whether it was she was just having an extremely bad day
> or - - his opinion was maybe years of drug and alcohol abuse - - but
> she was not very coherent. And from the questions she was asking
> [the investigator] one would get the impression it's, well, just tell me
> what I'm supposed to be saying, and that's what I was going to say.

Counsel recalled that the petitioner testified at trial, and he was an effective witness, reinforcing counsel's belief that the petitioner understood the nature of the proceeding. After this court's opinion on direct appeal, counsel notified the petitioner that he had filed a motion to withdraw but advised the petitioner that if the State retried him on the two convictions that were reversed on appeal, counsel would continue to represent him.

On cross-examination, counsel recalled that the petitioner had written a note during trial advising him that "there was a juror that was mouthing at him." Counsel did not see the juror attempt to speak with the petitioner. Counsel explained that he did not ask for the removal of the

juror involved in the conversation with the prosecutor because he was "more fearful of that alternate juror that [he] was of this one."

Counsel had never heard of Neal prior to Neal's testimony at the post-conviction hearing. Regardless, counsel stated that Neal's testimony was not consistent with the petitioner's testimony at trial, and, as a matter of strategy counsel would not have called him to testify for the petitioner.

Following the presentation of the State's proof, the post-conviction court continued the hearing to allow the petitioner to obtain the testimony of Constance Campbell.[3] Campbell testified that she had known the petitioner since 1996 or 1997 and that he had been her boyfriend "years ago." Campbell testified that the petitioner usually carried "a little small gun." The gun was silver, but she did not know the specific type or name of the gun. Campbell stated that she knew Jerome and Alfonso Gregory and recalled that they, along with the petitioner, had attended her brother's birthday party on January 21, 1998. Campbell's recollection of the event was limited; however, she stated:

> I can't really say what happened. They were in, the men were in one
> limousine, the women were in another. All I know is about the time
> we got to - - the Outback, there was a big ruckus going on. They had
> got into it in the car, so my mother, in turn, took Horace and I home.
>
> Campbell saw the petitioner on July 5, 1998, at her mother's house
> but could not remember if she saw him on July 6, 1998. She recalled,
> "all I know is all the activities took place between the 4th of July and
> I'd say the 7th. I don't remember the days." On the day the petitioner
> was with her, he left and told her he would be back in an hour. She
> attempted to page him several times, but he did not respond. She was
> eventually contacted by a detective who told her where the petitioner
> was in custody.

After the conclusion of the post-conviction hearing, the post-conviction court entered a twenty-three page order setting forth its findings of fact and conclusions of law. The post-conviction court found that the petitioner had failed to show by clear and convincing evidence that trial counsel was ineffective. Further, the court found that the petitioner had not demonstrated that he suffered any prejudice as a result of counsel's alleged ineffective assistance.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). "'Clear and convincing evidence means evidence in which there is no

---

[3] At the time of the post-conviction hearing, Campbell was incarcerated in Memphis but was transported to Davidson County for the hearing.

serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

"To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

On appeal, the petitioner asserts that the post-conviction court erred in finding that trial counsel was not ineffective. He asserts that counsel was ineffective by failing to request the dismissal of the juror who had engaged in ex-parte communication with the prosecutor during trial; trial counsel was ineffective by failing to ascertain the extent of the conversation between the juror, the prosecutor, and Officer Collins; trial counsel was ineffective by failing to inform the court that the same juror had attempted to communicate with the petitioner; trial counsel was ineffective by failing to call Constance Campbell to testify at trial; trial counsel was ineffective for failing to call a ballistics expert to rebut the testimony of the State's expert; and trial counsel failed to object to the prosecutor improperly leading a witness on direct examination. Additionally, trial counsel failed to confer and consult with the petitioner, seek discovery, investigate criminal charges, interview witnesses, and develop a working relationship with the petitioner. He also asserts that trial counsel should have had the petitioner undergo a mental evaluation.

First, we will address the petitioner's contention that the ex parte communication with the juror created a bias against the petitioner and that he should have been granted a new trial by the post-conviction court. The post-conviction court noted that the prosecutor immediately advised the trial court that he had inadvertently communicated with a juror and a police officer regarding another case. The post-conviction court read from the trial transcript the following comments of the prosecutor:

"I think I may have had some contact with Mr. Bailey, the juror, out in the hallway before we started, and the way that came up, and I'm not completely sure it was him, but the way that arose, I walked, I was here early and I think maybe Officer Collins was seated out there and the man seated beside Officer Collins, and the man, at that point to me looked like Mr. Emmet Jenkins, the bonding agent from the trial that I did last week, so I thought, and of course, he is up around here all the time, so I thought, that is Mr. Jenkins sitting there by the police officer, so I immediately tell who I think is Mr. Jenkins that the man got convicted last week on drug charges, and that he is going to get a substantial amount of time, and I think Officer Collins said something like well, that is good, or something like that, and the person who I thought was Mr. Jenkins looked puzzled at that point, but I didn't think anything else about it until I got in here and, you know, started handing stuff to the jurors, and I looked at him again, and I thought, well, that could explain a lot of things if that was, in fact, Mr. Bailey, so I'm afraid that it might well have been."

The post-conviction court noted that trial counsel's decision not to ask for removal of the juror was based upon his concern regarding the alternate juror. The post-conviction court found that counsel's decision was a strategic one entitled to deference. On appeal, this court will neither second guess the tactical and strategic decisions of defense counsel, nor measure the representation by "20-20 hindsight." Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993). Moreover, the post-conviction court found that the petitioner had failed to demonstrate that he was prejudiced by counsel's actions. We agree with the post-conviction court.

The petitioner also alleged the post-conviction court should have found that trial counsel was ineffective by failing to call Constance Campbell to testify at trial. According to the petitioner, Campbell's testimony would have established that the petitioner carried a small silver gun. Because the victim was shot with a .44 caliber gun, Campbell's testimony would have refuted the evidence establishing the petitioner as the shooter. Campbell would also have verified that Alfonso Gregory and Jerome Gregory were biased against the petitioner. The post-conviction court noted that the petitioner had failed to show that the witnesses' testimony would be favorable or that the testimony provided critical evidence in support of his defense. We agree.

The post-conviction court determined that the petitioner's claim that trial counsel was ineffective in failing to present the testimony of a ballistics expert was likewise without merit. First, we note that when a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner should present these witnesses at the evidentiary hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The post-conviction court noted that the petitioner failed to present the testimony of an expert at the post-conviction hearing. Although the petitioner provided the court with an article from an "online publication" on ballistics, the court found that the article was not relevant to the petitioner's claim. Further, the post-

conviction court found that the petitioner had failed to show that he suffered any prejudice. The record supports the finding of the post-conviction court.

Regarding the petitioner's claim that trial counsel failed to seek a mental evaluation of the petitioner, the post-conviction court accredited the testimony of counsel that based upon his observations and interaction with the petitioner, counsel saw no need for an evaluation. The post-conviction court found that the claim was without merit. The record supports this finding by the post-conviction court.

As to the petitioner's claim that counsel should have objected to the State asking leading questions of Jerome Gregory, the post-conviction court stated that it had reviewed the record and found the complaint without merit. In his appellate brief, the petitioner fails to provide any specific instances in support of his claim, asserting that Jerome Gregory's testimony was primarily a response to the prosecutor's questions. The petitioner summarily concludes that "[the petitioner] was prejudiced by the leading questions." The petitioner does not allege any specific prejudice as a result of counsel's failure to object. The evidence does not preponderate against the trial court's determination.

Finally, the petitioner alleges that "[t]rial counsel failed to confer and consult with the petitioner, seek discovery, investigate criminal charges, interview witnesses and not developing a working relationship with the petitioner." The post-conviction court accredited counsel's testimony that trial counsel met with the petitioner on numerous occasions at the Criminal Justice Center and at the courthouse. Counsel retained a private investigator, interviewed witnesses, and reviewed tapes of interviews conducted by the investigator. He provided the petitioner with summaries of the evidence and discussed with the petitioner the merits of his case and possible defense strategies. The post-conviction court further conclude that the petitioner had not shown that he was prejudiced by the failure to call additional witnesses. We agree with the post-conviction court.

In summary, we conclude that the evidence does not preponderate against the finding of the post-conviction court. Accordingly, the petitioner has failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel.

### III. Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE

-11-